**James William BISHOP, Petitioner-Appellee,**

v.

**Jim ROSE, Warden, Respondent-Appellant.**

No. 82–5256.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 7, 1982.

Decided March 8, 1983.

---

**25.** *Aqua Slide 'N' Dive*, 569 F.2d at 837.

William M. Leech, Jr., Atty. Gen. of Tenn., David Himmelreich, Asst. Atty. Gen., Nashville, Tenn., for respondent-appellant.

Lionel R. Barrett, Jr., William Redick, Nashville, Tenn., for petitioner-appellee.

Before LIVELY and KRUPANSKY, Circuit Judges, and BROWN, Senior Circuit Judge.

LIVELY, Circuit Judge.

In this habeas corpus action the district court found that the State of Tennessee had interferred with the relationship between the petitioner and his attorney to a degree which violated petitioner's Sixth Amendment right to the effective assistance of counsel, and directed that he be released unless the state grants him a new trial. We affirm.

## I.

### A.

The district court stated the facts as follows:

#### Facts

In May 1977 petitioner was tried and convicted of second degree murder and grand larceny in connection with the death and robbery of an elderly Wilson County, Tennessee, woman in August 1976. The State's case against petitioner was based entirely on circumstantial evidence.

Prior to his trial, petitioner was held in the Wilson County jail. While detained there, petitioner, at the request of his defense counsel, Mr. Robert Rochelle, drafted a handwritten statement detailing his activities and whereabouts for the period August 24–31, 1976. The deceased had been murdered, according to the prosecution's estimation, sometime on August 25, 1976. Mr. Rochelle had requested petitioner to draft the statement to help in preparation of petitioner's defense.[2]

On March 21, 1977, employees of the Wilson County Sheriff's Department searched the cell in which petitioner was housed as the result of an attempted escape by petitioner's cell mates. (Petitioner himself was not involved in the escape attempt, but the legality of the search is not disputed.) During the search, the employees discovered petitioner's handwritten statement. The Sheriff's employees took the statement and subsequently delivered a copy of it to Mr. R. David Allen, the Wilson County Assistant District Attorney General who was to prosecute petitioner's case. Mr. Allen stated at the evidentiary hearing that he received the statement well in advance of petitioner's trial.

After the search of his cell, petitioner discovered that his handwritten statement had been taken by the Sheriff's employees, objected to its confiscation, and demanded its return. A week later the Sheriff's Department transmitted the statement to Mr. Rochelle, petitioner's attorney.

At petitioner's trial, Mr. Allen, the prosecutor, sought to introduce petitioner's statement as direct evidence. Mr. Allen had read the statement and was aware of its contents. After hearing Mr. Rochelle's objection to the statement's introduction, the trial judge refused its admission as direct evidence.

Although he had disallowed introduction of the statement as direct evidence, the trial judge nevertheless permitted Mr. Allen to utilize it to impeach petitioner during his cross-examination. Petitioner took the stand at trial to testify, and part of his

testimony concerning the whereabouts of his wife was inconsistent with his written statement. In the presence of the jury and over the objections of Mr. Rochelle, Mr. Allen used portions of the statement to contradict petitioner's testimony. Referring repeatedly to petitioner's written statement, Mr. Allen's cross-examination of petitioner on that issue went thusly:

[GEN. ALLEN]: In any event, then starting from 4:00 o'clock in the morning on August 25th when you went to bed, 4:00 or 4:30, all the way through the day when you recited, you got up at 11:30, you say, you went to East High Market, you came back and went back to bed. You slept until about 3:00 or 3:30, nothing of consequence happened that day. You say somebody came by to visit Debbie, but she wasn't there and that girl left. You didn't go anywhere else that night until approximately 11:45 P.M. on the night of August 25th when Debbie came home?

A. On Thursday night?

Q. Yes, sir.

A. Correct.

Q. On Wednesday night, sir?

A. Thursday night, sir.

Q. Look to that, sir.

MR. ROCHELLE: Your Honor, objection.

THE WITNESS: Yes, sir, but may I explain something.

Q. Look to that and continue on to the second page until you come down to where it says "Thursday", and then go above Thursday and see if you didn't say, "Debbie came home on Wednesday night about 11:45?"

A. I would like to explain that before I answer this, sir.

Q. Well, I would like for you to answer my question, if you will.

THE COURT: All right. Answer the question.

MR. ROCHELLE: Your Honor, we object to the use of this document here.

GEN. ALLEN: I am not asking him to read it, Your Honor. I am asking him to check that document.

THE COURT: All right. Answer the question, Mr. Bishop.

THE WITNESS: In this document, it does state she came home Wednesday night.

Q. At 11:45?

A. Yes, sir, that is what it states here.

Q. Did she?

A. No, sir. She came home Thursday at 11:45. That statement was taken before it was completed from my hands.

Q. Then what about the statement about a friend of hers coming by that night? Was that statement also for Thursday?

A. No, sir. It was not.

Q. In any event, is it fair to say that basically you can't account for your time on Wednesday, August 25th from 4:00 o'clock in the morning until way on late at night, can you?

MR. ROCHELLE: Your Honor, he is trying to argue it to the Jury now. This man can account for his time. It is up to Gen. Allen to talk about whether that it a proper accounting or not. But this man has accounted...

THE COURT: Overruled. You may ask the question.

Q. You cannot account for your time, sir, from around 4:00—at least 4:00 or 4:30 in the morning when you were home by yourself before you went to bed that morning on Wednesday, weren't you?

A. Yes, sir.

Q. And you say you went to bed at 4:00 or 4:30 Wednesday morning, August 25th?

A. Yes, sir.

Q. And you cannot and have no witness to account for what you did for practically the whole day of August 25th, can you?

A. I cannot prove it by a witness, but I can account for where I was at.

Q. You have no witness that will establish where you were, do you sir?

A. None that I know of.

GEN. ALLEN: Yes, sir. Thats all.

Trial Transcript, 369–372.

The only significance of the time of his wife's return was that on direct examina-

tion petitioner had testified she returned home on Thursday night whereas the document stated that she returned on Wednesday. Though it is clear that the document was used for impeachment purpose, the trial court did not give a limiting instruction at the time of its ruling or in its general charge to the jury.

[2] Petitioner initially had been appointed counsel by the trial court. The appointed counsel had withdrawn from the case, however, and Mr. Rochelle assumed representation of petitioner. Because of the relatively late assumption by Mr. Rochelle of petitioner's case, he had requested that petitioner draft the statement in question here. The statement was a crucial tool for Mr. Rochelle in preparing petitioner's defense.

### B.

In his motion for a new trial the petitioner relied upon the seizure of the document, the trial court's failure to read the document and to hear all proof offered on the issue before ruling on petitioner's motion to dismiss for invasion of the attorney-client relationship, and its permitting the prosecutor to use the document in cross-examination. The trial court overruled the motion without making any findings or conclusions with respect to the issues raised.

In the Tennessee Court of Criminal Appeals the petitioner included four separate assignments of error relating to the seizure and use of the 14-page document. Assignment # 5 stated, "The Court erred in allowing the State to cross-examine the Defendant by reading from and referring to the privileged confidential communication between the Defendant and his attorneys."

In its opinion the Tennessee Court of Criminal Appeals dealt with the attorney-client issue as follows:

Defendant says he was denied due process and the right to effective assistance of counsel because a document he categorizes as a confidential communication between him and his counsel was seized from his jail cell. On March 21, 1977, prior to his trial on May 2nd, while defendant was incarcerated in Wilson County Jail, a jail break was attempted by other inmates in the cell. This brought about a search in which, among other things, a document prepared by defendant was seized by sheriff's deputies. The instrument was a day by day account of defendants' actions for several days prior and subsequent to the date of the homicide. He claimed this was prepared at the request of his attorney for use in his defense. Copies were made and turned over to investigating officers. The original was turned over to his attorney on the 28th of March, approximately one week after it was taken from his cell. It was defendant's argument that any effort to establish an alibi defense had been prejudiced by disclosure of the contents of the document to the investigating officers and the district attorney general. The trial judge declined to allow the State to admit the document into evidence on direct examination but subsequently allowed its use for cross-examination of the defendant. We find no fault with that judgment. It is conceded that the authorities had the right to search the cell after the attempted escape came to their attention. Certainly they had a right to examine whatever may have been found there. There was no indication in the paper writing that it was a confidential instrument of any nature. It was not essential for the court to read the document in question to rule on the legality of the seizure or its temporary retention by the authorities. At the hearing defendant proposed to introduce witnesses to show that the officers made copies of the instrument before turning it over to his attorney. The court did not question that fact. Defendant does not show in what manner he was prejudiced. The document was not addressed to anyone. It was unsigned. It was not incriminating in any sense other than it indicated defendant had been to the victim's home prior to the homicide and contained reference to some jewelry purportedly purchased from a stranger. These were matters which he testified to at trial. Defendant was not inhibited in his alibi defense. Under current procedure, upon demand made, a defendant is required to

give notice of an alibi defense specifying the place or places which he claims to have been at the time together with the name and addresses of witnesses upon whom he intends to rely to establish the defense (Rule 12.1, Tennessee Rules of Criminal Procedure, effective July 13, 1978). We overrule the assignment.

*Bishop v. State*, 582 S.W.2d 86, 89–90 (Tenn. Cr.App.1979).

## II.

### A.

After the State filed its answer to the habeas corpus petition the district court ordered an evidentiary hearing to determine whether petitioner "suffered prejudice as a result of the State's acquisition and use at trial of petitioner's written statement." The two attorneys who had tried the *Bishop* case—David Allen for the State and Robert Rochelle for Bishop—testified at the hearing. Rochelle testified that he and his associate asked Bishop to attempt to write out an account of his activities during the period of time surrounding the crime with which he was charged. The purpose of the document was to help the attorneys reconstruct Bishop's activities, locate witnesses and otherwise prepare for trial. The witness emphasized that the document was not Bishop's final draft, but had been taken from him "in the preparation stage." This created difficulties for the defense because Bishop's final recollection of some of the events was different after reflection and questioning. Though the document was not a precise statement the prosecutor used it to give the jury the impression that Bishop had previously given a statement which differed from his in-court testimony. Rochelle testified that Allen held the document in his hand and raised it above his head as he questioned Bishop.

Allen testified that the 14-page document came into his possession some months before trial. He said he did not consider the document confidential or important and did not rely on it in preparing for trial. He minimized the importance of his use of the document during the trial. Allen testified

that the jury did not know what he had in his hand and "the jury didn't know what was being impeached." He denied holding the document above his head or otherwise posturing as he cross-examined Bishop. Two of the jurors at the trial also testified. Neither could remember how Allen held the document as he cross-examined Bishop, but both testified they could not read the papers in Allen's hand. The 14-page document was received as an exhibit after the verdict, but was never given to the jury.

### B.

Relying on the state court records and its own evidentiary hearing the district court concluded that petitioner's Sixth Amendment right to assistance of counsel was violated. The court found that the 14-page document was prepared by Bishop at his attorney's request and was intended to help in preparation of his defense; that the document was delivered by a member of the sheriff's staff to the prosecutor well in advance of trial; and that when Bishop discovered his loss he advised an employee of the sheriff's office that the document was intended for his attorney and demanded its return. After being copied the document was turned over to attorney Rochelle. The district court found that the document was a confidential communication between petitioner and his counsel and that Bishop clearly suffered prejudice from the state's intrusion into the attorney-client relationship.

The district court recognized that every intrusion by the prosecution into the confidential relationship between a criminal defendant and his counsel does not constitute a Sixth Amendment violation. However, the court concluded that the delivery of the document to the prosecutor and its use at the trial prejudiced petitioner and denied him his Sixth Amendment right to assistance of counsel. The district court determined that dismissal of the indictment was not warranted because a new trial would be an effective remedy for the violation.

## III.

### A.

■ On appeal the State of Tennessee argues that the district court failed to give due deference to the finding of the Tennessee Court of Criminal Appeals that the prosecutor's use of the document did not prejudice Bishop in any way. In a habeas corpus action brought by a state prisoner in federal court factual determinations made by a state court following a hearing on the merits are presumed to be correct. 28 U.S.C. § 2254(d) (1976). This presumption can be rebutted if the petitioner proves, or the respondent admits, any one or more of eight specified conditions which would impugn the reliability of the state court findings. § 2254(d)(1)–(8). The presumption of § 2254(d) applies to the findings of a state appellate court as well as those of a state trial court. *Sumner v. Mata,* 449 U.S. 539, 545–46, 101 S.Ct. 764, 768, 66 L.Ed.2d 722 (1981). When a federal habeas corpus court decides to "dispense with the 'presumption of correctness'" it must include some "reasoned written references to § 2254(d)" in its disposition. *Id.* at 549, 101 S.Ct. at 770. Though the ultimate issue of the constitutionality of a given state action presents a mixed question of law and fact which is not governed by § 2254(d), the basic, historical facts which underlie the ultimate conclusion are so governed. *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982) (per curiam) (second review following remand and decision by Court of Appeals. *See Mata v. Sumner,* 649 F.2d 713 (9th Cir.1981).)

It is clear to us that in this case the state courts did not make a factual determination on the critical issue related to interference with the attorney-client relationship. The state trial court held that seizure of the document was not unlawful, a ruling which is not contested, but gave no explanation for its denial of the motion for a new trial based on the prosecutor's use of the document at trial. The Court of Criminal Appeals stated the issue as follows: "It was defendant's argument that any effort to establish an alibi defense had been preju-

diced by disclosure of the contents of the document to the investigating officers and the district attorney general." The state appellate court completely ignored the assignment of error related to the prosecutor's use of the document prior to and at the trial and made no findings on the claim that this use constituted an unlawful interference with the confidential relationships of a criminal defendant and his attorney. From its restricted view of petitioner's argument and its failure to treat the matter of the prosecutor's use of the statement, it is clear that the state appellate court's statement, "Defendant does not show in what manner he was prejudiced[ ]," is not a finding that Bishop suffered no prejudice from that use. The single finding of an underlying fact in the opinion, "Defendant was not inhibited in his alibi defense[ ]," reinforces the conclusion that the reviewing court was considering only the seizure of the document as the claimed Sixth Amendment violation. Since the state courts made no determination of fact with respect to the claim of constitutional deprivation as presented to them by Bishop, 28 U.S.C. § 2254(d) has no application to this case.

### B.

Since the state courts had made no express findings on critical elements of a constitutional claim the district court properly held an evidentiary hearing. *Townsend v. Sain,* 372 U.S. 293, 313–14, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963). The testimony taken at the hearing, together with the state court records, fully supports the factual findings of the district court and its conclusion that a Sixth Amendment violation occurred. The district court carefully analyzed *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), in reaching this conclusion. In *Weatherford* an undercover agent (Weatherford) who was arrested with another suspect (Bursey) maintained his cover after release on bail. At the invitation of Bursey, Weatherford attended several meetings between Bursey and his attorney. In an action for damages brought by Bursey pursuant to 42 U.S.C.

§ 1983 the district court found that the agent did not divulge to other government officials "trial plans, strategy, or anything having to do with the criminal action against the plaintiff." *Id.* at 548, 97 S.Ct. at 840. The Supreme Court found that there is no *per se* rule that every intrusion by the state into the relationship between a criminal defendant and his attorney results in a Sixth Amendment violation. The Court noted that Weatherford was invited by Bursey to attend the meetings and was not "planted" to gain information about trial strategy. Further, the agent communicated nothing to other officials and his testimony at the trial revealed nothing said or done at the meetings. None of the state's evidence was derived from the meetings. In reversing the court of appeals and upholding the district court's dismissal of the action the Supreme Court wrote:

> There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment.

*Id.* at 558, 97 S.Ct. at 845.

Before *Weatherford* this court applied an "intrusion plus" requirement to Sixth Amendment claims of unlawful interference with attorney-client relations. In *United States v. Valencia,* 541 F.2d 618 (6th Cir.1976), we held there is no necessary inference of prejudice to be drawn from the government's intrusion into the relationship between a defendant in a criminal case and his attorney; there must be a showing of prejudice as well as a showing of intrusion. The use of tainted evidence, *i.e.,* evidence obtained as a result of the intrusion would demonstrate prejudice and require a new trial. *Id.* at 623. *See also Ray v. Rose,* 535 F.2d 966, 976 (6th Cir.1976) (per curiam.)

Since *Weatherford* a number of courts of appeals have dealt with the requirement that some prejudice be shown. The Third Circuit holds that if privileged information obtained by the government's interference with the attorney-client relationship is actu-

ally communicated to prosecution authorities there has been a Sixth Amendment violation. There is no need to establish the exact degree of prejudice actually suffered. *United States v. Levy,* 577 F.2d 200, 209 (3d Cir.1978) ("We think that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case."). The District of Columbia Circuit also treats disclosure of privileged information as a critical factor. *United States v. Kember,* 648 F.2d 1354, 1365 (D.C.Cir.1980).

In *United States v. Dien,* 609 F.2d 1038, 1043 (2d Cir.1979), *Weatherford* was construed as holding that a Sixth Amendment violation occurs if the government intentionally invades the attorney-client relationship or privileged information resulting from an unintentional intrusion is disclosed and prejudice results. The obvious way to establish prejudice resulting from a disclosure is to show that the information was used for the benefit of the government or the detriment of the defendant. *See Mastrian v. McManus,* 554 F.2d 813, 821 (8th Cir.1977) (The accused must show that the substance of a monitored conversation was of some benefit to enforcement officials); *United States v. Irwin,* 612 F.2d 1182, 1187 (9th Cir.1980) (Prejudice results when evidence gained through interference with the attorney-client relationship is used against the defendant at trial). The Court in *Weatherford* stated that it would have taken a different view of the case "had those overheard conversations been used in any other way to the substantial detriment of Bursey." 429 U.S. at 554, 97 S.Ct. at 843.

## C.

██ In the present case the confidential information was used for the benefit of the prosecution and to the substantial detriment of Bishop. Though the trial court had ruled the 14-page document inadmissible as evidence, the prosecutor used it in cross-examining petitioner to give the impression that his testimony before the jury was dif-

ferent from something he had said in a written statement. All of the evidence of guilt was circumstantial. When Bishop elected to testify and sought to explain the circumstantial evidence his credibility became a critical issue. Use of the privileged document to attack his credibility did prejudice his case; it struck at the foundation of the only defense he presented. Though the time of his wife's return may not have been of great importance, it was the use of a reference in the document to her return which enabled the prosecution to raise the inference that Bishop had changed his story. In closing argument the prosecutor capitalized on this earlier use of the document, saying to the jury, "You wonder at the inconsistencies in this man's statement." Since the confidential information was used in this case for the benefit of the prosecution and to the detriment of the defendant, it is unnecessary for us to decide whether the communication of such information, without more, may sufficiently establish prejudice to support a finding of a Sixth Amendment violation.

### IV.

#### A.

The State argues that evidence obtained in violation of the Fourth Amendment may be used for impeachment purposes and that the same rule should apply to confidential communications between attorney and client. *See United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The situations are not analogous. *Havens* and *Harris* placed limits on the exclusionary rule by permitting illegally seized evidence to be used for impeachment. The use of the evidence in those cases did not implicate a separate and additional constitutional right. Only the prohibition against unlawful searches and seizures was involved. However, when the prosecution gets evidence before the jury which is based on confidential communications between the defendant and his attorney it also impinges on the Sixth Amendment right to counsel. In this case we are not dealing with the scope of the judge-made exclusionary rule which is a remedy for a constitutional violation. Our concern is with a constitutional right which is at the heart of our adversary system of criminal justice.

#### B.

The State argues, finally, that any error in the use of the confidential document was harmless beyond a reasonable doubt. In *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), the Supreme Court defined harmless constitutional error by quoting from its earlier decision in *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963), "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." By this definition the trial court's error in permitting the prosecutor to use the confidential document cannot be considered harmless. Assuming without deciding that a Sixth Amendment violation by interference with the confidential relationship between a defendant and his attorney is subject to the harmless error rule, we conclude it would be impossible to find beyond a reasonable doubt that the conduct of the prosecutor in this case did not contribute to petitioner's conviction.

The district court properly directed that Bishop be retried, as dismissal of the indictment was not required. *See United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1980).

The judgment of the district court is affirmed.