959 N.E.2d 1245 (2011)
355 Ill. Dec. 512
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Maurice A. McRAE, Defendant-Appellant.
No. 2-09-0798.
Appellate Court of Illinois, Second District.
October 24, 2011.
*1247 Thomas C. Brandstrader, Attorney at Law (Court-appointed), Chicago, for Maurice A. McRae.
Joseph P. Bruscato, Winnebago County State's Attorney, Lawrence M. Bauer, Deputy Director, State's Attorneys Appellate Prosecutor, Constance Augsburger, Attorney at Law, Mt. Morris, for People.

OPINION
Justice BIRKETT delivered the judgment of the court, with opinion.
¶ 1 Defendant, Maurice A. McRae, appeals his conviction of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2008)) involving the November 11, 2007, shooting death of Larry Starks. Defendant's conviction was the result of a negotiated plea of guilty in exchange for a sentence of 27 years in the Illinois Department of Corrections. On appeal, defendant contends that his plea of guilty was involuntary because it was based upon erroneous legal advice of trial counsel, namely, that a letter defendant wrote to counsel, which was confiscated from his jail cell, could be used against him at trial. We find that, because the agreed-upon sentence fell below the minimum sentence of 45 years, the entire plea agreement is void, and we remand the cause to allow defendant to withdraw his plea and proceed to trial if he so chooses. Because the issue of the admissibility of the letter will likely recur on remand, we also address the trial court's ruling that the letter was not privileged because it was not kept in an envelope marked "legal mail."

¶ 2 I. BACKGROUND
¶ 3 On April 1, 2008, defendant, then 17 years of age, was arrested for the November 11, 2007, murder of Larry Starks. Bail was set at $1 million, which defendant was unable to post. The public defender was appointed to represent defendant. On May 1, 2008, the Winnebago grand jury returned an eight-count indictment charging defendant with six counts of first-degree murder, each alleging that defendant shot Larry Starks in the upper body, thereby causing his death. 720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2008). Counts VII and VIII of the indictment charged codefendant James Houston with the offenses of mob action (720 ILCS 5/25-1(a)(1) (West 2008)) and aggravated battery (720 ILCS 5/12-4(b)(8) (West 2008)). A 14-count superseding bill of indictment was returned on May 28, 2008. Count I alleged that defendant "personally discharged a firearm that proximately caused great bodily harm or death to Larry Starks, in violation of 720 ILCS 5/9-1(a)(1) and 730 ILCS 5/5-8-1(a)(1)(d)(iii) * * * sentencing enhancement range of an additional 25 years to natural life pursuant to 730 ILCS 5/5-8-1(a)(1)(d)(iii)." Counts II through VII also alleged first-degree murder involving the shooting death of Larry Starks and, with the exception of count IV, alleged an enhanced sentencing range predicated upon the use of a firearm. Count VIII, to which defendant entered a negotiated plea of guilty, read:
"That on or about the 11th day of November, 2007, in the County of Winnebago, State of Illinois, MAURICE A. McRAE committed the offense of FIRST DEGREE MURDER, in that *1248 he, without lawful justification, shot Larry Starks in the upper body with a firearm, knowing such acts created a strong probability of death or great bodily harm to Larry Starks, thereby causing the death of Larry Starks, in violation of 720 ILCS 5/9-1(a)(2) (Class M Felony) (minimum sentence of 20 years imprisonment)."
¶ 4 Counts XIII and XIV recharged Houston with mob action and aggravated battery. The record reveals that the case was continued several times on defense motions, for the purpose of reviewing the discovery material tendered by the State. On March 17, 2009, defendant's attorney Frank Perri informed the trial court that he was in the process of negotiating a resolution of the case. Counsel also informed the court that the busy "high volume" courtroom that he was assigned to left him with insufficient time to devote to defendant's case. The assistant State's Attorney had no objection to the continuance and confirmed that there had been "some meaningful discussions" with defense counsel. The trial judge told the parties that she was giving the case a short date, "[b]ut if it's not resolved, we're going to go to trial on it." The case was continued to April 20, 2009, for a final pretrial conference along with a June trial date.
¶ 5 On April 20, 2009, defense counsel informed the court that he had "gotten what [he] want[ed]" and said "we're trying to resolve the case. We're still in negotiations. I'm going to talk to Mr. McRae about this matter. If not, just leave it on for trial." On May 5, 2009, defense counsel filed a supplemental answer to discovery, listing: "Affirmative Defense: Self-Defense." On May 21, 2009, the parties appeared in open court and announced that they had arrived at an agreement. Defense counsel described the details of the agreement: that defendant would be "pleading to count 8 of the Bill of Indictment, and all other counts will be dismissed per plea. He had accepted the offer of 27 years in the Department of Corrections in this case." Defense counsel informed the court that he and co-counsel Coates had spent a considerable amount of time with defendant and had answered all the questions they could for him. The trial court carefully admonished defendant pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 1997). During the admonitions, the court advised defendant that the sentencing range on count VIII was 20 to 60 years in the Department of Corrections. In response to the court's questions, defendant informed the court that he understood the charge; that he had no additional questions; that he was satisfied with defense counsel's representation; that no threats or promises had been made in order to get him to enter his plea; that no threat or force had been used against him; and that he was entering into the plea of his own free will. The State then presented the statement of facts to support the plea:
"On March 10, 2008, detectives met with Douglas Bell, who told police in summary that he had spoken to Maurice, who he called Big Boy, around November 13 of 2007. That person is the defendant, Maurice McRae. He said that Big Boy pulled him aside and told him that he had just murdered a cluck, which is a slang word for someone who uses crack, and that happened on Lee Street, and that he had used a gun." (Emphasis added.)
¶ 6 The factual basis also included a summary of statements from alleged eyewitness Antwon Donohue:
"On April 3, 2008, detectives met with Donohue. Donohue indicated that he was at the party, that earlier at the *1249 party he gave Big Boy, McRae, the gun. He stated that Big Boy was kicked out of the house that the party was at. And he indicated that later Big Boy came to the door of the party and that James Houston went outside. He looked outside and saw James Houston and Big Boy with two white males. He indicated that Big Boy and James were fighting with the white males. He advised that he went after the white male with the hoodie, grabbed him, and that this was on the sidewalk. He indicated that he swiveled and looked over his left shoulder and that this is when he saw Big Boy, McRae, pull out a gun. Big Boy said, `Move, James.' And as the guy who Big Boy and James were with got up, Big Boy pointed the gun at him and shot him."
The prosecutor then summarized the proposed testimony of Houston:
"Among other things, Houston stated that Big Boy was punching the guy with the book bag. He stated that when he went to help him that Houston hit the man three to four times. He also stated that Big Boy had the gun and shot the victim."
Finally, the prosecutor stated that the autopsy performed on Starks determined that the cause of death was "hemorrhagic shock as a consequence of a gunshot wound to the abdomen."
¶ 7 The trial court then further inquired of defendant, admonished him that he must serve 100% of his sentence, accepted defendant's formal plea of guilty, and entered a judgment of conviction for the offense of first-degree murder. Pursuant to the agreement, the court sentenced defendant to 27 years in the Department of Corrections plus 3 years of mandatory supervised release. Defendant was admonished of his right to appeal and how to perfect an appeal by first filing a motion to withdraw his plea of guilty.
¶ 8 On June 1, 2009, defendant filed a pro se "Motion to Vacate Plea." The motion alleged, in part, that his attorney provided "ineffective assistance of counsel, in regards to his plea of guilty." In support of this claim, defendant alleged that his attorney failed to file "standard motions of defense on behalf of his client." The motion also alleged that counsel induced defendant to plead guilty by telling him that "there was no hope for him in trial" and that if he did not take the "deal" he would spend "most of his life locked up." Defendant alleged that if trial counsel "would have made any effort to defend him he would not have plead [sic] guilty."
¶ 9 The motion also accurately set out the legal standard for the trial court to permit the withdrawal of a plea of guilty that "was entered on misapprehension of the facts or the laws, or in consequence of misapprehension by counsel." On June 2, 2009, Perri filed a "Motion Pursuant to Supreme Court Rule 604D," alleging that defendant did not "knowingly, intelligently and voluntarily waive his right to a jury trial" and did not fully "understand or comprehend" the court's admonitions. The motion requested that the court allow defendant to withdraw his plea or in the alternative reduce the sentence imposed.
¶ 10 On July 29, 2009, the trial court conducted a hearing on defendant's motion to withdraw his guilty plea. The State reminded the court that defense counsel had also filed a motion. Defense counsel filed a certificate pursuant to Illinois Supreme Court Rule 604(d) (eff. July 1, 2006), and the trial court indicated that it had read the entire transcript of the plea. The trial court then inquired which of the two motions the defense would be proceeding on. Defense counsel stated, "[J]udge, it was his belief that he was gonna get to *1250 address his own motion." The assistant State's Attorney pointed out that the pro se motion's allegations of ineffective assistance of counsel would have to be addressed before a notice of appeal could be filed. Defense counsel then replied, "we'll incorporate his motion with ours so that we can address it all." The case was passed so that defendant could review the allegations made in the motion filed by defense counsel. When the hearing resumed, the trial court questioned defendant regarding the factual basis for his claims of ineffective assistance of counsel, in order to determine whether new counsel should be appointed.
¶ 11 Defendant, the court, and counsel discussed at length the letter defendant had written to defense counsel, which was confiscated from his jail cell. Defendant informed the court that the letter contained information "about my case that happened, admittin' to it, and they confiscated it an they was usin' it against me as evidence. So they didn't file no motion formy lawyer didn't file no motion for me to get that, you know what I'm sayin', get it dismissed from me, about the letter." The court noted that the letter was not brought up at the time of the plea and was not part of the factual basis. Defendant told the court that before the plea his attorneys told him that the letter "was gonna be used against" him if he went to trial. He told the court that his attorneys told him that the letter "was probably the reason [he] was gonna lose [his] case is because it is a confession orwhatever you wanna call it." The court then asked a series of questions clarifying defendant's position that the letter was to counsel; that it was confiscated from his jail cell; that his attorneys told him that the letter could be used against him; and that he felt that his attorneys should have filed a motion to suppress the letter. Regarding the basis for a motion to suppress the letter, the court then asked:
"THE COURT: Based upon what grounds?
[DEFENDANT] I wasn'tI wasn't givin' the confession to the state's attorneys to use against me inin court. I was usI was lettin' my lawyer and them know what happened in this case, you know what I'm sayin', what happened this night in this case.
THE COURT: Uh-huh.
[DEFENDANT]: I wasn't confessin' to the state's attorney so that they could use it against me in trial."
¶ 12 Defendant explained to the court that he was led to believe that, because of the letter, he had no hope at trial. Coates then explained that the defense had received the letter in discovery and that counsel had talked to defendant about the letter, but Coates said that "[a]t no time in our discussions did he indicate it was taken out of an envelope that was marked, `legal mail' and had Mr. Perri's name on it." Coates explained that if the letter had been in an envelope they would have investigated it further. Coates explained that it was counsel's understanding that defendant's cell mate had seen the letter and reported it to the guards, who confiscated it. Counsel's understanding was that it was not taken out of an envelope marked "legal mail." The court then pointed out to defendant that he "didn't indicate that it was in an envelope to the court," now or in his written motion. The following exchange then took place:
"[DEFENDANT]: Oh. I told them. I let them know when they came
THE COURT: Just now.
[DEFENDANT]: Now, whenwhen he came to talk to me about the letter I said, man, theythey violated my constitutional rights, man, for takin' this letter out of my cell because they weren't *1251 supposed to take this letter out of my cell, man,
THE COURT: Okay.
[DEFENDANT]: and by sendin' it to y'all, man, and that's what I told him.
THE COURT: Okay. And that, again, does not mention anything
MR. COATES: And that's exactly
THE COURT: about an envelope.
MR. COATES: that's exactly what he told us, your Honor.
THE COURT: That's exactly what you said.
[DEFENDANT]: It'sit'sit's legal mail because I intended to send them the letter.
THE COURT: Notnotnotnot not just because you intend to send it to them. It has to be somehow clearly marked as legal mail, which apparently it wasn't.
[DEFENDANT]: II meI mean I did intend toII intended to send it to him, but if my cellee went through mymymymy belongin's, you know what I'm sayin', you take my letter out, I mean what was I supposed to do? I I don'tI didn't know about it. I was gonna send it out. It was my intention to send it out.
THE COURT: Yeah, but thatit you didn't, and it wasn't in a letter marked or an envelope marked `legal mail' and so there was no violation."
¶ 13 Coates explained that, when they received the discovery from the State and talked to defendant, defendant did not say that he could go back to his cell and get the envelope. Coates said that if that would have happened, it would have "sealed it" for the defense, and they would have filed a motion at that point. Defendant replied that counsel did not bring up the letter until he was "fittin' to go to trial" and, at that point, he no longer had the envelope because he had thrown it away. The assistant State's Attorney informed the court that the State had provided "everything that [it] received. There was no envelope." He also reminded the court that the State made no reference to "the contents of this letter in the statement of facts, for what that's worth." At the conclusion of the discussion regarding the letter, the court found that defendant had not "set forth any basis which would lead the court to appoint alternative counsel at this time for your motion to withdraw your plea."
¶ 14 Following brief arguments, the trial court found that there was no basis for the court to vacate defendant's guilty plea and further that counsel did not "in any way appropriately or incorrectly" advise him based upon the allegations that he made and "the facts as they appear to be."
¶ 15 Defendant filed a timely notice of appeal. In his initial brief, defendant argued that this court should remand the case for further proceedings because the trial court erred in not appointing substitute counsel to represent him on his motion to withdraw his plea, which alleged ineffective assistance of counsel. While this case was pending before us, the Illinois Supreme Court decided People v. White, 2011 IL 109616, 352 Ill.Dec. 159, 953 N.E.2d 398. The factual basis in White alleged that the defendant was accountable for a cab driver's murder, which was committed by shooting the victim in the temple with a handgun. The 15-year mandatory firearm enhancement provision of the Unified Code of Corrections meant that the defendant was eligible for a 35- to 75-year sentence, but he received a sentence of only 28 years. See 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2004). In White, the Illinois Supreme Court held that, when the factual basis for a guilty plea makes it clear that a defendant is subject to a mandatory *1252 sentencing enhancement, the trial court may not enter a judgment imposing a sentence that does not include the enhancement on the basis that the parties excluded the enhancement in the plea agreement. White, 2011 IL 109616, ¶ 22, 352 Ill.Dec. 159, 953 N.E.2d 398. The court held that, because the sentence did not conform to the statutory requirements, it was void, "[a]nd because defendant was not properly admonished, the entire plea agreement is void as well." White, 2011 IL 109616, ¶ 21, 352 Ill.Dec. 159, 953 N.E.2d 398.
¶ 16 We ordered the parties to address the issue of whether defendant's sentence is void in light of White. Defendant, in his supplemental brief, contends that White controls and his plea and sentence are void. The State concedes that defendant's sentence is void because it falls below the range of any of the firearm enhancements for first-degree murder and that, because defendant was not properly admonished, the entire plea agreement is void as well.

¶ 17 II. ANALYSIS

¶ 18 A. Void Sentence
¶ 19 We first address the issue of the sentence imposed by the court. Because the issue of attorney-client privilege related to the letter might be a factor on remand, we will also address that issue.
¶ 20 The outcome of this appeal is governed by White, 2011 IL 109616, 352 Ill. Dec. 159, 953 N.E.2d 398. In White, the defendant entered a negotiated plea of guilty to first-degree murder in exchange for a sentence of 28 years in the Illinois Department of Corrections. Pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 1997), the trial court admonished White that the sentencing range was 20 to 60 years' imprisonment. The factual basis provided by the State showed that White was an accomplice in an armed robbery, during which White's codefendant shot the cab driver to death with a handgun. The weapon used to murder the victim was recovered on White's person. On appeal, White contended that he was subject to the 15-year mandatory firearm enhancement provision (730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2004)) for being armed with a firearm, making the sentencing range 35 to 75 years' imprisonment, not 20 to 60 years as the trial court had advised him. White argued that, because he received a sentence that was not authorized by statute, his plea and sentence were void. The appellate court agreed with White, citing People v. Rodriguez, 229 Ill.2d 285, 322 Ill.Dec. 563, 891 N.E.2d 854 (2008) (holding that the 15-year enhancement provision applies to a defendant who is convicted based on a theory of accountability), and reversed and remanded the case. The Illinois Supreme Court granted the State's petition for leave to appeal and affirmed the appellate court. The court made it clear:
"Under the Unified Code of Corrections, the legislature has imposed specific requirements upon circuit courts with respect to the imposition of enhanced sentences when firearms are used in the commission of first degree murder. The circuit court is responsible for enforcing those requirements and imposing the appropriate sentence." White, 2011 IL 109616, ¶ 21, 352 Ill.Dec. 159, 953 N.E.2d 398 (citing People ex rel. Waller v. McKoski, 195 Ill.2d 393, 399-401, 254 Ill.Dec. 729, 748 N.E.2d 175 (2001)).
The Illinois Supreme Court held that, because White's sentence did not conform to the statutory requirements, his sentence was void, and because he was not properly admonished, his entire plea agreement was also void. White, 2011 IL 109616, ¶ 21, 352 Ill.Dec. 159, 953 N.E.2d 398.
*1253 ¶ 21 Here, defendant was admonished at the time of his plea that the sentencing range was 20 to 60 years' imprisonment. The factual basis offered by the State showed that defendant "personally discharged a firearm that proximately caused * * * death to another person" (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008)), triggering a mandatory sentencing enhancement of 25 years to natural life. As the supreme court made clear in White, when the factual basis for a plea of guilty triggers a mandatory sentencing enhancement, neither the State, in plea negotiations, nor the court, at sentencing, may fashion a sentence that does not include the mandatory enhancement. White, 2011 IL 109616, ¶ 22, 352 Ill.Dec. 159, 953 N.E.2d 398.
¶ 22 Defendant's sentence did not conform to the statutory guidelines, and the trial court exceeded its authority when it ordered a lesser sentence than the statute mandates. White, 2011 IL 109616, ¶ 12, 352 Ill.Dec. 159, 953 N.E.2d 398. Therefore, defendant's sentence is void, and because the trial court failed to properly admonish defendant that he faced a mandatory sentence of 45 years to natural-life imprisonment, the entire plea agreement is also void.

¶ 23 B. Attorney-Client Privilege
¶ 24 While our decision in this case is controlled by White, defendant properly preserved the issue of whether his right to effective assistance of counsel was violated where a letter he wrote to defense counsel regarding his case was confiscated from his jail cell and where counsel, instead of filing a motion to suppress the letter, informed defendant that the contents of the letter could be used against him at trial. Defendant's contention is that the admissibility of the letter, and any use whatsoever of the letter by the State, is prohibited by attorney-client privilege. Because this issue is likely to be a factor on remand, we will address it.
¶ 25 The discussion of the confiscated letter took place during a hearing pursuant to People v. Krankel, 102 Ill.2d 181, 80 Ill.Dec. 62, 464 N.E.2d 1045 (1984), to determine whether defendant's pro se motion alleging ineffective assistance of counsel required the appointment of new counsel. Defense counsel confirmed defendant's allegations that the letter was intended to be sent to counsel only; that defendant's cell mate discovered the letter and tipped off the guards, who confiscated it; and that defendant felt that his constitutional rights were violated. Yet, the trial court ruled that, because the letter was not in an envelope marked "legal mail," there was no violation. On that basis, that trial court ruled that new counsel would not be appointed and that counsel's advice regarding the letter was not inappropriate or incorrect. Generally, rulings on the admissibility of evidence are reviewed for abuse of discretion. However, the applicability of a privilege raises a question of law, which we review de novo. See Cangelosi v. Capasso, 366 Ill.App.3d 225, 227, 303 Ill.Dec. 767, 851 N.E.2d 954 (2006); Mueller Industries, Inc. v. Berkman, 399 Ill.App.3d 456, 463, 340 Ill.Dec. 55, 927 N.E.2d 794 (2010) (although a discovery order is generally reviewed for an abuse of discretion, a trial court's determination of whether a privilege applies is reviewed de novo.)
¶ 26 The letter in question was not tendered to the trial judge for her review, which is the procedure commonly followed when questions of attorney-client privilege arise. See People v. Boclair, 129 Ill.2d 458, 481, 136 Ill.Dec. 29, 544 N.E.2d 715 (1989). However, both defense counsel and the State confirmed defendant's description of the letter and how it was discovered by the State. The letter was *1254 written to defense counsel and contained defendant's explanation of what occurred the night of the murder. The letter was initially discovered by defendant's cell mate, who notified the jail guards. The letter was confiscated by the guards, who turned it over to the State's Attorney's office. The trial court focused on what effect defendant's failure to keep the letter in an envelope marked "legal mail" had on his claim of attorney-client privilege. The State's position, without citation to authority, was that, since the letter was not in an envelope, it was legally obtained. Defense counsel and the trial court accepted this rationale and wrongly concluded that the letter would be admissible at trial, as defense counsel had advised defendant.
¶ 27 The trial court appears to have based its ruling on the premise that, as an inmate, defendant had no legitimate expectation of privacy in the letter unless he kept it in an envelope marked "legal mail." While it is true that inmates have no legitimate expectation of privacy under the fourth amendment in the contents of their cells, they retain "those rights not fundamentally inconsistent with imprisonment * * * or incompatible with the objectives of incarceration." Hudson v. Palmer, 468 U.S. 517, 523, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). An inmate does not knowingly waive attorney-client privilege with respect to documents retained in his or her cell simply because there is no reasonable expectation of privacy in those documents under the fourth amendment. Rather, the two inquiries are independent of each other. United States v. DeFonte, 441 F.3d 92, 94 (2d Cir.2006) (per curiam).
¶ 28 While it is undisputed that prison and jail officials have legitimate interests in providing for the safety and security of staff and inmates, those interests must be balanced with the sixth amendment right to effective assistance of counsel, which includes the right to communicate privately with counsel. The confusion here between defendant's privacy interests, which were de minimis, and his right to effective assistance of counsel began when Coates first raised the envelope issue. Attorneys who receive mail from inmates are accustomed to receiving the letters in envelopes clearly marked "privileged," pursuant to the provisions in title 20 of the Illinois Administrative Code. 20 Ill. Adm.Code 525.130(c) (2011). Such mail, unlike nonprivileged mail, must also be sealed when it is submitted for delivery and may be opened only in an emergency or where "there is reasonable suspicion that dangerous contraband is contained therein, legal services is consulted, and the mail is opened in the offender's presence." 20 Ill. Adm.Code 525.130(d) (2011). The Administrative Code also provides that the means used to examine the mail for dangerous contraband should not damage the mail or "permit the mail to be read." 20 Ill. Adm.Code 525.130(d) (2011). We also note that both the Unified Code of Corrections (730 ILCS 5/3-2-2(t) (West 2008)) and the Code of Criminal Procedure of 1963 (725 ILCS 5/103-4 (West 2008)) ensure that prisoners' and inmates' privileged communications with their attorneys, whether in person, by telephone, or through the mail, will not be subject to monitoring by the State.
¶ 29 The law clearly provides that an inmate retains his or her sixth amendment right to effective assistance of counsel, which includes the ability to communicate privately with his or her attorney without interference. See People v. Savage, 361 Ill.App.3d 750, 758, 297 Ill. Dec. 760, 838 N.E.2d 247 (2005). Communications made in confidence by a defendant to his or her attorney are protected from disclosure by the attorney-client privilege. People v. Childs, 305 Ill.App.3d *1255 128, 136, 238 Ill.Dec. 490, 711 N.E.2d 1151 (1999). Whether the attorney-client privilege applies to a communication requires an examination of the circumstances surrounding the communication. People v. Knippenberg, 66 Ill.2d 276, 282-83, 6 Ill. Dec. 46, 362 N.E.2d 681 (1977). In People v. Adam, 51 Ill.2d 46, 48, 280 N.E.2d 205 (1972), the Illinois Supreme Court stated:
"The attorney-client privilege exists in order that one who is, or seeks to become a client, may consult freely with counsel without fear of compelled disclosure of information communicated by him to the attorney whom he has employed, or seeks to employ. The essentials of its creation and continued existence have been defined as follows: `(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.' 8 John H. Wigmore, Evidence, sec. 2292 (McNaughton Rev. 1961)."
¶ 30 In this case, during the Krankel hearing it was uncontested that defendant's letter was written to counsel for the purpose of legal advice in anticipation of trial and was intended to be kept confidential. Unless defendant waived the privilege, defense counsel had a duty to guard against the use of the letter. See People v. Curry, 1 Ill.App.3d 87, 90, 272 N.E.2d 669 (1971). The failure to keep the letter in an envelope marked "legal mail," while possibly relevant, does not, in and of itself, amount to a waiver of the attorney-client privilege.
¶ 31 While the full circumstances of the recovery of the letter from defendant's cell were not disclosed, the facts elicited at the Krankel hearing were clearly insufficient for the trial court to rule that "there was no violation." In Bishop v. Rose, 701 F.2d 1150 (6th Cir.1983), a search of a state prisoner's cell, after an attempted jail break by other inmates, led to the seizure of a 14-page handwritten statement detailing his activities and whereabouts on the days leading up to the murder he was charged with committing. The document was not addressed and was not in an envelope, but it was prepared by the prisoner to assist his attorney. The defense objected to the State's use of the document, on the ground of privilege. The trial court excluded the use of the document during the State's case but allowed the State to use it in cross-examining the defendant. The Tennessee Court of Criminal Appeals upheld the conviction, finding that the defendant "was not inhibited in his alibi defense." Bishop v. State, 582 S.W.2d 86, 89-90 (Tenn.Ct.App. 1979). The defendant filed a federal habeas corpus petition, and the district court concluded that the defendant's sixth amendment right to effective assistance of counsel was violated. The United States Court of Appeals for the Sixth Circuit agreed.
¶ 32 In upholding the district court's ruling, the Sixth Circuit discussed the appropriate analysis in determining whether a sixth amendment violation has occurred. The court discussed Weatherford v. Bursey, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), a federal civil rights case in which Bursey claimed that a sixth amendment violation occurred when Weatherford, an undercover agent, sat in on meetings with Bursey and his attorney. In Weatherford, the United States Supreme Court found no violation because no privileged communication was used at trial or even divulged to the prosecutors. The Court did state that Bursey would have had a much stronger case if Weatherford *1256 had "testified * * * to the conversation between Bursey and Wise [defense counsel]; had any of the State's evidence originated in these conversations; had those * * * conversations been used in any way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey-Wise conversations about trial preparations." (Emphasis added.) Weatherford, 429 U.S. at 554, 97 S.Ct. 837.
¶ 33 In discussing cases involving surreptitious recordings of inmate conversations with counsel, the Court made the following observation:
"If anything is to be inferred from these two cases with respect to the right to counsel, it is that when conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial." (Emphasis added.) Weatherford, 429 U.S. at 552, 97 S.Ct. 837.
¶ 34 Turning back to Bishop v. Rose, the Sixth Circuit pointed out that, while fourth amendment violations may be used for impeachment purposes, violations of the sixth amendment are not analogous. The court rejected the State's harmless-error claim, stating, "it would be impossible to find beyond a reasonable doubt that the conduct of the prosecutor in this case did not contribute to petitioner's conviction." Bishop v. Rose, 701 F.2d at 1157.
¶ 35 Another case of interest is DeFonte. In DeFonte, while awaiting trial, an inmate in the Manhattan correctional center kept a journal. The inmate was scheduled to be a witness in the prosecution of a guard for crimes he committed while on duty. The government became aware of the existence of the journal, which was delivered to the United States Attorney's office. Shortly before the guard's trial, the guard's lawyer became aware of the journal and moved for production. The inmate's lawyers moved to intervene for a protective order, asserting attorney-client privilege. The district court denied the motion, finding that the documents were not protected by attorney-client privilege and that the inmate "had no expectation of privacy in the contents of her cell." DeFonte, 441 F.3d at 94. The Second Circuit reversed, holding that, while an inmate has a considerably lower expectation of privacy under the fourth amendment, an inmate "does not, however, knowingly waive attorney-client privilege with respect to documents retained in her cell simply because there is no reasonable expectation of privacy in those documents for fourth amendment purposes. Rather, the two inquiries are independent of each other." DeFonte, 441 F.3d at 94. The court remanded the case with directions to the district court to conduct a hearing to determine which of the writings fell within the scope of the privilege. The court stated that an outline of what an inmate wished to discuss with counsel, and which is subsequently discussed with one's counsel, "would seem to fit squarely within our understanding of the scope of the privilege." DeFonte, 441 F.3d at 96. The court also noted that on remand the district court could consider whether the inmate "treated the notes in question in such a careless manner as to negate her intent to keep them confidential," for example, by turning them over to a party other than her attorney. DeFonte, 441 F.3d at 96.
¶ 36 Here, defendant alleged that, on a tip from his cell mate, the State searched his cell for the express purpose of seizing his letter to his defense counsel regarding his case. Such conduct is similar to the intentional recording of inmates' conversations with their lawyers. In one such *1257 case, the Supreme Court of South Carolina reversed a murder conviction and disqualified the prosecutor's office where the police surreptitiously recorded the defendant's conversations, with the prosecutor's knowledge. State v. Quattlebaum, 338 S.C. 441, 527 S.E.2d 105 (2000). The court stated that "[t]he right to counsel would be meaningless without the protection of free and open communication between client and counsel." Quattlebaum, 527 S.E.2d at 107
¶ 37 The Illinois Supreme Court addressed a case involving deliberate prosecutorial intrusion into communication protected by attorney-client privilege in People v. Knippenberg, 66 Ill.2d 276, 6 Ill.Dec. 46, 362 N.E.2d 681 (1977). In Knippenberg, the defendant was charged with murder. The trial court found him to be indigent and appointed the public defender to represent him. Private counsel was later appointed. The attorney secured the service of an investigator to assist him in the defense. The investigator, with the approval of the defendant and his attorney, interviewed the defendant at the jail. Unbeknownst to the defendant or his attorney, the investigator furnished a copy of a summary of the defendant's interview to the State's Attorney, who surprised the defense with the summary while cross-examining the defendant at trial. The Illinois Supreme Court, in commenting on the conduct of the State, said:
"What occurred here was violative of the notion of a fair trial and completely offensive to the concept of the effective assistance of counsel. The prejudice to the defendant was grave and inexcusable. Under the sixth amendment an accused has the right to effective assistance of counsel, which is applicable to State criminal proceedings through the due process clause of the fourteenth amendment. (Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 [(1964)].) It has been observed that the `essence of the Sixth Amendment right is * * * privacy of communication with counsel.' United States v. Rosner, (2d Cir.1973) 485 F.2d 1213, 1224." Knippenberg, 66 Ill.2d at 285, 6 Ill.Dec. 46, 362 N.E.2d 681.
¶ 38 As the court observed in Knippenberg, it is common for an attorney to employ agents who are "`indispensable to his work and the communications of the client being often necessarily committed to them by the attorney or by the client himself, the privilege must include the persons who act as the attorney's agents.'" Knippenberg, 66 Ill.2d at 284, 6 Ill.Dec. 46, 362 N.E.2d 681 (quoting 8 John H. Wigmore, Evidence § 2301, at 583 (McNaughton rev. ed.1961)). It is even more common for clients who are incarcerated to communicate in the form of letters to their attorneys. It is for this reason that an inmate's need for confidentiality in his communications to his attorneys is particularly important. See Bach v. People, 504 F.2d 1100, 1101 (7th Cir.1974) (holding that inmates are entitled to be present during opening of legal mail). Here, based upon the facts available at the time of the trial court's ruling, its determination that "there was no violation" of the attorney-client privilege was wrong as a matter of law.
¶ 39 We note that the State disclosed the letter and that it made no mention of the letter or its contents during the presentation of the factual basis for defendant's plea. Arguably, the State recognized that the letter was indeed subject to the attorney-client privilege and was therefore inadmissible. The record before us does not reveal whether the assistant State's Attorney was even aware of the circumstances of the discovery of the letter until after its seizure. We trust that on remand an appropriate *1258 inquiry will be made, on motion of either party, into all the circumstances regarding the seizure of the letter and whether defendant treated the letter in such a careless manner as to negate his intent to keep it confidential. See DeFonte, 441 F.3d at 94-95.

¶ 40 III. CONCLUSION
¶ 41 Because the trial court's imposition of a 27-year sentence pursuant to the plea agreement was void for noncompliance with section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008)), we reverse the order denying defendant's motion to withdraw his guilty plea. The cause is remanded to the trial court with directions to allow defendant to withdraw his guilty plea and proceed to trial if he so chooses.
¶ 42 The judgment of the circuit court of Winnebago County is reversed and the cause is remanded for further proceedings consistent with this opinion.
¶ 43 Reversed and remanded with directions.
Justices McLAREN and HUTCHINSON concurred in the judgment and opinion.