# Illinois Official Reports

## Appellate Court

---

### *People v. Maron*, 2019 IL App (2d) 170268

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT Q. MARON, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-17-0268 |
| Filed | December 31, 2019 |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, Nos. 13-CF-652, 13-CF-653, 16-CF-832; the Hon. Sharon L. Prather, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Steven L. Walker, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Patrick D. Kenneally, State's Attorney, of Woodstock (Patrick Delfino, Edward R. Psenicka, and John G. Barrett, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion.<br>Justices McLaren and Bridges concurred in the judgment and opinion. |

**OPINION**

¶ 1 Defendant, Robert Q. Maron, pleaded guilty to two counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1), (b) (West 1996)) and one count of aggravated criminal sexual abuse (*id.* § 12-16(c)(1)(i)). There were three separate victims, each of whom was under age 13. The trial court sentenced defendant to two 14-year sentences and one 4-year sentence, to run consecutively, for a total of 32 years.

¶ 2 On appeal, defendant challenges the admission at the sentencing hearing of videotaped statements he made to police. At the sentencing hearing, the State admitted that the statements were taken in violation of defendant's sixth amendment right to counsel. The theory was that the statements were obtained during the course of a separate investigation of an uncharged offense, concerning a victim who is not part of this case. The interview occurred, however, while defendant was in custody for the charged offenses and represented by counsel for the charged offenses. Defendant received a basic *Miranda* warning for the investigation concerning the uncharged offense. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Despite the *Miranda* warning, per *People v. Kidd*, 129 Ill. 2d 432, 453-54 (1989), the State violated defendant's right to counsel *in this case*. Once the State charged defendant with the offenses in this case, the right to counsel attached to those charged offenses. Also, once defendant had retained counsel for the charged offenses, the State had an affirmative duty to honor that relationship, which it breached when it failed to notify counsel of the interview on the uncharged offense and instead elicited statements that would be used against him at sentencing here. (The State changes its position on appeal to argue that no sixth amendment violation occurred, but the record does not support affirming on that new ground.)

¶ 3 Defendant contends that, because the statements were obtained in violation of his sixth amendment right to counsel, they should not have been admitted at sentencing under any circumstances. He acknowledges that evidence obtained in violation of the *fourth* amendment may be allowed at trial for nonsubstantive purposes, such as impeachment, or at sentencing for substantive purposes, pursuant to the exclusionary-rule balancing test. See *People v. Rose*, 384 Ill. App. 3d 937, 942 (2008). However, citing *Bishop v. Rose*, 701 F.2d 1150, 1156-57 (6th Cir. 1983),[1] defendant asserts that the sixth amendment affords stronger protections than the fourth amendment as it pertains to the admission of unlawfully obtained evidence.

¶ 4 We disagree with defendant's reading of *Bishop*. Instead, we determine that *Bishop*, together with *Kansas v. Ventris*, 556 U.S. 586, 590-91 (2009), supports the conclusion that what matters is not which constitutional guarantee was violated, the fourth or the sixth, but when and how the constitutional guarantee was, or could be, violated. If the introduction of the evidence could itself constitute or exacerbate the violation, then the evidence is inadmissible. If, on the other hand, the violation has already occurred and the purpose of the exclusion would be to deter unlawful police conduct in the future, then the exclusionary-rule balancing test applies. Here, the violation occurred when the police obtained the statements, and the purpose of the exclusion would be to deter unlawful police conduct in the future. Therefore, the trial court properly applied the exclusionary-rule balancing test, and it did not abuse its discretion in deciding to admit the statements at the sentencing hearing.

---

[1] While *Bishop* is not binding on this court, we favorably cited *Bishop* in *People v. McRae*, 2011 IL App (2d) 090798, ¶ 31.

¶ 5 Finally, defendant argues that the trial court relied on an improper sentencing factor. We disagree. Accordingly, we affirm.

¶ 6                                     I. BACKGROUND

¶ 7 This case involves three charged offenses: (1) the predatory criminal sexual assault of C.D. in that defendant placed his finger in C.D.'s vagina (No. 13-CF-652), (2) the predatory criminal sexual assault of J.S. in that defendant placed his finger in J.S.'s vagina (No. 16-CF-832), and (3) the aggravated criminal sexual assault of A.A. in that defendant touched A.A.'s vagina (No. 13-CF-653). Each of the crimes occurred between 1996 and 1998, and each of the victims was under age 13. Defendant, who was born in 1968, was over age 17.

¶ 8 In 2013, while defendant was in custody in McHenry County for the charged offenses, the Schaumburg Police Department sought to investigate defendant for the uncharged offense. The victim was defendant's stepdaughter, who alleged that defendant placed his finger in her vagina when she was 16 years old in the mid-2000s. She reported that defendant assaulted her when her mother was in the hospital, having just given birth to twins (who were fathered by defendant).

¶ 9 The McHenry County Sheriff allowed a Schaumburg detective to interview defendant concerning his stepdaughter's allegations. The officers did not notify defendant's retained counsel. The interview was videotaped. Defendant received a basic *Miranda* warning, and he signed a waiver. Defendant confessed to assaulting his stepdaughter. He claimed that he began giving his stepdaughter an ordinary muscle massage, "like he would give his wife," when he entered a dreamlike state. When he realized that his finger was in his stepdaughter's vagina, he awoke from his dreamlike state. He knew that he had gone too far, and he felt remorse. This portion of the interview lasted approximately three to four minutes.

¶ 10 After defendant confessed to assaulting his stepdaughter, the Schaumburg detective asked defendant if there was anything else that defendant "wanted to get off his chest." Defendant asked the detective if he meant A.A. and C.D., two of the victims of the *charged* offenses. The detective appeared to assent, asking "what happened?" Defendant proceeded to describe his actions against A.A. The detective then reminded defendant of C.D. Defendant responded by describing his actions against C.D. Defendant again claimed that he had been in a dreamlike state when he assaulted A.A. and C.D. He did not awake from the dreamlike state until he realized that he had violated the girls. He said that he felt remorse. This portion of the interview lasted approximately two to three minutes.

¶ 11 During the portion of the interview concerning the charged offenses, the detective asked defendant approximately 20 questions. These ranged from general prompts, such as providing defendant with a summary and then asking "Is that correct?" to specific questions, such as "And you put your hand where?" Other questions included: "What was the name?"; "What happened with that?"; "You want to stress again [that you were] tired?"; "Tell me if this is correct"; "Did you ever [take out] your penis?"; "Did you ever anally penetrate?"; "What was that—same thing? [*i.e.*, Did you do the same thing to C.D.?]"; "[Did that occur] in a tent or somewhere else?"; "Was it planned?"; and "Once you touched the vagina, did you pull out because you realized it was wrong?"

¶ 12 The stepdaughter's allegations ultimately resulted in separate charges, pending in another county. In the meantime, in February 2017, defendant accepted a partially negotiated plea

arrangement and pleaded guilty to the three charged offenses at issue here. (The terms of the partially negotiated guilty plea are not in the record.)

¶ 13    In April 2017, the trial court conducted a sentencing hearing. The State moved to admit the video of the interview by the Schaumburg detective. Defense counsel stated that in preparation for trial he had drafted a motion to suppress the interview on sixth amendment grounds. However, after counsel spoke with the State, defendant chose not to go to trial and instead entered the partially negotiated guilty plea.

¶ 14    The State admitted that defendant's sixth amendment right to counsel had been violated, stating, "If this matter had proceeded *to trial*, it [is] the State's position that most likely under almost no circumstances could I think of how that would not have been suppressed." (Emphasis added.) Despite the violation, the State maintained that the video was admissible. It cited *Rose*, 384 Ill. App. 3d 937, noting that, there, the sentencing court had allowed evidence that was obtained in violation of the fourth amendment, even though that evidence would have been suppressed at trial. Defendant responded that *Rose* was inapposite because it concerned a fourth amendment, as opposed to a sixth amendment, violation.

¶ 15    The trial court agreed with the State and admitted the video:

"I would grant that [*Rose*] is factually distinguishable from this case in that the *Rose* case dealt with [a] fourth amendment violation and in this case we have a sixth amendment violation regarding statements.

However, the reasoning in *Rose* is well applicable to this case. The case indicates that the exclusionary rule does not generally apply to sentencing hearings. Defendant's objection to the admission of the tape will be overruled."

¶ 16    Next, the State submitted victim-impact statements from all three victims in this case. Two of the victims were present and read their statements aloud. One of the victims explained that she had been so innocent at the time of the offense that it took her years to understand what had happened to her. All of the victims reported that defendant's actions had damaged their lives and their psychological well-being.

¶ 17    Cary police detective Susan Ellis testified to her investigation of the charged offenses. While investigating the charges, she contacted the police departments in municipalities where defendant had lived previously. This led to the discovery of other offenses. Also, defendant himself told Ellis of an offense he committed against his sister. Thus, in addition to the three victims at issue in this case, Ellis learned of four other victims. These victims included his stepdaughter, two young girls in Rock Falls, and his 12-year-old sister (when he was 16). Additionally, defendant had child pornography on his computer, and he once physically harmed his pregnant wife.

¶ 18    Regarding his stepdaughter, and as set forth in the video, defendant gave her a massage and then inserted his finger into her vagina. He also hid in her closet, wearing only his underwear, and he watched through the door's wood slats as she showered. When she caught him, he told her that he had only been trying to scare her.

¶ 19    Regarding the young girls in Rock Falls, he engaged in a game of truth or dare with them. They were 12 or 13 years old. He dared them to pull down their pants. When they refused, he spanked them. The incident was reported to the police but did not result in charges. Defendant explained that he had only been trying to teach them a lesson because they had asked him to disrobe first.

¶ 20    Regarding his sister, defendant had sexual relations with her. His sister came forward soon after, and defendant was "shipped off" to a sexual-predator rehabilitation program in Minnesota. Ellis could not locate the program.

¶ 21    After Ellis interviewed defendant, defendant immediately called his wife and told her to destroy information on his computer. The police heard the phone call because defendant made the call from the interview room. Officers were able to obtain a warrant in time to search the home. They obtained evidence from the computer, including a pornographic image of an eight-year-old girl in an explicitly sexual position. There was also a record of an online communication between defendant and an unknown girl. The girl stated that she was having sexual intercourse with her father. Defendant replied that "there should be more girls out there like [her]."

¶ 22    Finally, Ellis spoke with defendant's ex-wife, who told her that defendant once physically hurt her. When she was pregnant and asleep, defendant fired a taser weapon at her. She awoke, and defendant laughed and told her that he just wanted to see what would happen.

¶ 23    The State also submitted presentencing reports, sex-offender risk-assessment reports, and a psychological evaluation. The reports showed that defendant had no major psychiatric illness, though he did have clinically significant levels of anxiety. Defendant had been sexually abused as a child. The reports ultimately concluded that defendant was at moderate-high risk for recidivism, based on "his lack of empathy for the victims, his lack of responsibility for his actions, his history of sexual trauma, and instability in his life."

¶ 24    Defendant did not call any witnesses. The parties presented their arguments. Part of the State's argument was as follows:

"THE STATE: Your Honor, when sentencing the defendant today, I think it's very important to keep in mind that if defendant had committed these offenses a mere three or four years later, Your Honor really wouldn't have as much a decision to make today. That's because in 2000 the legislature enacted a statute—

DEFENSE COUNSEL: Objection, Your Honor. This is not relevant for purposes of sentencing. It's before the court as charged when the violations took place.

THE COURT: *Overruled. It's argument, [counsel]. Go ahead, [State].*

THE STATE: In 2000, the legislature enacted a statute indicating that an individual who is convicted of two separate incidents of predatory criminal sexual assault receives a sentence of natural life in prison. We wouldn't have to sit here hearing about all these stories, reading the written statements, listening to the interview, going through the victim impact statements. We wouldn't have to do that because Your Honor wouldn't have the discretion.

When the legislature makes a law, think about it. When they're thinking about punishment, when they're thinking about laws, they're taking lots of things into consideration. They're taking damage to the public. They're taking the harm to the victim. They're taking the likelihood that the individual would commit the offense again. After all that consideration, after all those things, the legislature said predatory criminal sexual assault, one of the worst crimes there is, and a person who does it more than once should never be released from prison. He is a danger to society, and the world is better with him inside.

Your Honor, I'm not saying that because I believe that this is the law that applies here today. I'm not saying that.

I'm saying that because I think the *logic and reasoning* behind that applies to this case.

Just because these victims were abused three to four years before the 2000 law, doesn't mean they're any less victims. It doesn't make his crimes any less. They're the exact same crimes, they just were committed three or four years [earlier].

And, Your Honor, most importantly, the defendant isn't here just because of two predatory criminal sexual assaults. The defendant is here because there's two predatory criminal sexual assaults. There's an aggravated criminal sexual abuse. There's a criminal sexual assault.

The defendant is literally the poster child of a child molester. He is a danger to society.

Your Honor, the defendant needs to be sentenced in *the harshest manner possible*. The damage he's done is irreparable, and the world is a safer place with him in custody." (Emphases added.)

The State also stressed the harm that defendant caused the three victims, defendant's criminal history, and defendant's likelihood of recidivism. It asked for a total sentence of 60 years.[2]

¶ 25 Defendant argued that he had remorse for his actions. That is why he pleaded guilty. He took responsibility for his actions, and he even self-reported some of his other crimes to investigating officers. Additionally, defendant himself was abused as a child.

¶ 26 Defendant also made a statement in allocution. Defendant said that he was haunted by his past, but he admitted that this was not an excuse for his actions. He wished he could change his actions. He concluded: "I beg forgiveness not only from the young ladies but as well from their families. I'm sorry."

¶ 27 The trial court sentenced defendant to a total of 32 years, as stated. It considered the charges, the evidence (including the video), the arguments, defendant's statement in allocution, and all factors in aggravation and mitigation. It stated that defendant was a predator who took the innocence of young children. It further stated:

"The court would acknowledge that [defendant] has in fact accepted responsibility for the crimes that he has committed. That is a credit to him. He also appears to be remorseful for his past actions.

However, there are no mitigating factors that outweigh the serious nature of the charges and the crimes that he has committed."

¶ 28 Defendant moved to reconsider, raising the same arguments he raises on appeal. The trial court denied the motion. This appeal followed.

¶ 29                                    II. ANALYSIS

¶ 30 On appeal, defendant argues that a new sentencing hearing is required, because the trial court erred in (1) admitting the videotaped interview, obtained in violation of defendant's sixth amendment right to counsel, and (2) considering as a factor in aggravation a statutory

[2]The "harshest" possible sentence would have been 67 years: 30 years for each predatory criminal sexual assault and 7 years for the aggravated criminal sexual abuse.

amendment enacted after defendant committed the charged offenses. For the reasons that follow, we reject defendant's arguments.

## A. The Videotaped Interview

At the sentencing hearing, the State admitted that a sixth amendment violation had occurred, stating: "[A]lmost no circumstances could I think of how that would not have been suppressed [at trial]." The State then proceeded to argue why the evidence should nevertheless be admitted at sentencing *despite the sixth amendment violation*. Even though we ultimately determine that the video was admissible regardless of whether a sixth amendment violation occurred, we discuss the nature of the violation, particularly its timing and the police conduct involved, to add context to our admissibility analysis.

Thus, we begin by discussing the sixth amendment and the nature of the violation. Then, we consider the video's admissibility at the sentencing hearing, despite the violation. For the purposes of this analysis, we assume, as defendant concedes, that the evidence was relevant and reliable. We determine that the exclusionary-rule balancing test applies because the violation occurred during the interview and the purpose of the exclusion would be to deter unlawful conduct by police in the future, not to prevent a further violation of defendant's constitutional right to counsel. Under this test, the trial court did not err in admitting the video. Moreover, we reject defendant's allegation of prejudice based on an apparent lack of remorse demonstrated in the video because the trial court specifically found defendant to be remorseful.

## 1. The Sixth Amendment Violation

The sixth amendment guarantees that all criminal defendants shall have the assistance of counsel. *Estelle v. Smith*, 451 U.S. 454, 469 (1981). The right to counsel is essential to the fair administration of our adversarial criminal justice system. *Maine v. Moulton*, 474 U.S. 159, 168 (1985). With this right, the constitution recognizes that the average defendant does not have the professional legal skill to protect him or herself. *Id.* at 169. The right to counsel cannot be limited to participation in a trial. *Id.* at 170. Depriving a person of counsel prior to trial could be more damaging than the denial of counsel during the trial itself. *Id.* The right to counsel thus attaches prior to trial, at earlier, critical stages in the criminal justice process, where occurrences can settle the defendant's fate and render the trial a mere formality. *Id.* It attaches when criminal judicial proceedings are initiated against him or her, whether by formal charge, preliminary hearing, indictment, information, or arraignment. *Estelle*, 451 U.S. at 469-70. Once it attaches, the accused has the right to rely on counsel as a medium between him or her and the State. *Maine*, 474 U.S. at 176. The defendant has the right to have counsel present at various critical pretrial interactions with the State, including during the deliberate elicitation by law enforcement officers of statements pertaining to the charge. *Ventris*, 556 U.S. at 590.

"Once the accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." *Patterson v. Illinois*, 487 U.S. 285, 290 n.3 (1988). The State must honor the defendant's right to counsel. *Maine*, 474 U.S. at 170. This means more than not preventing the defendant from obtaining the assistance of counsel. *Id.* at 171. The State has an affirmative obligation to respect and preserve the defendant's choice to seek the assistance of counsel. *Id.* "[A]t the very least, the prosecutor and the police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Id.* The State's affirmative

obligation to respect and preserve the right to counsel must be considered when the court evaluates whether a particular action by the State or its agents violates the defendant's right to counsel. *Id.* at 176. Knowing exploitation of a situation where the defendant is likely to make incriminating statements outside the presence of counsel can be as much of a breach as the intentional creation of such a situation. *Id.* While the sixth amendment is not violated where the State obtains incriminating statements by luck or happenstance, any knowing circumvention of the defendant's right to have counsel present at a confrontation between the defendant and a State agent will constitute a violation. *Id.*

¶ 37                                          i. *Kidd*

¶ 38        For the purposes of understanding the sixth amendment violation here, we outline how this case is analogous to *Kidd*, 129 Ill. 2d 432. In *Kidd*, the defendant was charged with many crimes, including several counts of murder, after he and/or the codefendant fatally stabbed four people and set fire to their apartment in 1984. While the defendant was in custody for the 1984 crimes, the assistant state's attorney learned that the defendant might have set a 1980 fire that killed 10 children. The assistant state's attorney contacted the Chicago police detective who investigated the 1980 fire. That detective interviewed the defendant about the 1980 fire while the defendant was in custody for the 1984 crimes. The detective knew that the defendant was represented by counsel at the time of the interview, but the detective did not notify counsel of the interview. The defendant received a standard *Miranda* warning, and he waived his rights. After being shown pictures of the victims, the defendant confessed to setting the 1980 fire. Meanwhile, the defendant pleaded guilty to the 1984 crimes. He later moved to withdraw his plea, but the court denied the motion.

¶ 39        The State sought the death penalty, so the case proceeded to the first phase of the death-penalty hearing. At the first phase, a jury found that the requisite three aggravating statutory factors existed as to the 1984 crimes. At the second phase, the State presented as evidence in aggravation the testimony of the detective who had investigated the 1980 fire. The detective told the jury that 10 children died and that the defendant confessed to that crime. The defendant testified, and he denied starting the 1980 fire. The jury determined that no mitigating factors precluded the imposition of the death penalty, and the court sentenced the defendant to death.

¶ 40        On appeal, the court determined that the defendant should have been allowed to withdraw his plea because the trial court failed to inform him of the minimum sentence required by law. *Id.* at 446-47. The court then addressed issues that could arise again on remand, such as the improper admission of the defendant's confession to the 1980 fire at the death-penalty hearing for the 1984 crimes. The court held that the admission of that confession violated the defendant's sixth amendment right to counsel because the statements were elicited deliberately in the absence of the defendant's counsel. *Id.*

¶ 41        The court acknowledged that the defendant had been given a standard *Miranda* warning. *Id.* at 453-54. The court noted, however, that " '[o]nce an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect.' " *Id.* at 454 (quoting *Patterson*, 487 U.S. at 290 n.3). Under the circumstances, that meant notifying the defendant's counsel for the 1984 crimes before interviewing the defendant about an uncharged offense. However, because the defendant did waive his *Miranda* rights, his confession to the 1980 fire could be used in proceedings pertaining to that offense, should the State pursue charges relating to that offense. *Id.* at 452.

- 8 -

¶ 42    As in *Kidd*, defendant here was in custody for the charged offenses when police allowed him to be questioned by law enforcement from another jurisdiction. Again, defendant was charged with multiple sex crimes in McHenry County. These charges involved three victims, all unrelated to him and under age 13. He was arrested and remained in the custody of the McHenry County Sheriff throughout the pendency of these charges. At all relevant times, he was represented by counsel on these charges. While these charges were pending, the Schaumburg detective learned that defendant had been accused of a similar crime, involving defendant's stepdaughter. The Schaumburg detective was granted access to defendant by the McHenry County Sheriff. At no time did either the Schaumburg detective or the McHenry County Sheriff notify defendant's attorney of the planned interrogation.

¶ 43    The interrogation was videotaped. During the first three to four minutes of the interrogation, defendant confessed to multiple acts against his stepdaughter. The Schaumburg detective then asked defendant whether he had anything else that he wanted to "get off of his chest." The interrogation continued for an additional two to three minutes, during which defendant confessed to acts alleged in the McHenry County charges.

¶ 44    Ultimately, defendant entered into a partially negotiated plea agreement on the McHenry County charges, and the matter was set for sentencing. At the sentencing hearing, the State sought to introduce the entire video of the interrogation. Defendant objected, arguing that his statement was taken in violation of his sixth amendment right to counsel and that the violation precluded the use of the statement for any purpose, including in aggravation at sentencing. The State admitted that the interrogation violated defendant's sixth amendment rights as to the charged offenses and would not be admissible at a trial on the charged offenses, but it urged that the video should not be excluded at sentencing. The trial court agreed with the State, admitting the video.

¶ 45    Thus, we assume, without deciding, that for the purposes of this appeal, defendant's sixth amendment right to counsel had attached as to the charged offenses, the interview violated defendant's sixth amendment rights, and the video would not be admissible at a trial on the charged offenses. The only question remaining is whether the trial court erred in admitting the video at sentencing.[3]

¶ 46                    ii. Remaining Points Concerning the Sixth Amendment Violation

¶ 47    Before proceeding to that issue, however, we briefly address the State's remaining points concerning the sixth amendment. Despite its admission below, the State changes its position on appeal to argue that no sixth amendment violation occurred and that the trial court's decision to admit the video may be affirmed on that alternative basis. We understand that an appellee may advocate for affirmance on any basis supported by the record, even if that basis was not advanced below. *Downs Swimming Pool, Inc. v. North Shore National Bank*, 124 Ill. App. 3d 457, 462 (1984). Nevertheless, here, the State's argument is rebutted by the record and misstates the law.

_____

[3]Defendant's right to counsel had not attached as to the uncharged offense (see *Kidd*, 129 Ill. 2d at 452) and the State did not admit that it had. However, at no time did the State or defendant distinguish between the portion of the interrogation on the charged offenses and the portion concerning the uncharged offense. Therefore, neither do we. We take the video as a whole when considering its admissibility.

¶ 48 First, the State argues that *Kidd* is distinguishable because *Kidd* is a death-penalty case. This distinction does not matter for the purposes of determining whether a sixth amendment violation occurred. The sixth amendment violation occurred during the interview. See *Ventris*, 556 U.S. at 592. The violation occurred regardless of whether the State ultimately sought the death penalty. That *Kidd* is a death-penalty case is a distinction that will matter in the next portion of our analysis, concerning whether the video was nevertheless admissible at sentencing.

¶ 49 Second, the State argues that the police acted properly because they had a legitimate interest in investigating the uncharged offense, they issued a *Miranda* warning, and defendant waived his rights. *Kidd* acknowledged that the police might have had a legitimate interest in investigating the separate offense and might have conducted *that* investigation properly. The evidence obtained from that investigation would be admissible in a prosecution for the separate offense if law enforcement pursued charges for it. *Kidd*, 129 Ill. 2d at 452. Moreover, *Kidd* expressly addressed the defendant's waiver of his *Miranda* rights and held that, under the circumstances, the waiver was not dispositive. *Id.* at 453-54. Thus, per *Kidd*, the circumstances cited by the State here are not dispositive.

¶ 50 Finally, the State argues that defendant forfeited his right to challenge any sixth amendment violation because he pleaded guilty. The cases relied upon by the State, *McCann v. Richardson*, 397 U.S. 759, 766 (1970), and *People v. Brown*, 41 Ill. 2d 503, 505 (1969), are inapposite. These cases involved the legitimacy of the defendants' guilty pleas, an issue that is not raised here. In any event, as demonstrated by *Rose*—the very case the State cited at the sentencing hearing in support of its primary position—a court may consider at a sentencing hearing following a guilty plea the admissibility of evidence obtained in violation of a constitutional right. See, *e.g.*, *Rose*, 384 Ill. App. 3d 937.

¶ 51                     2. The Video Was Admissible at Sentencing

¶ 52 We next consider the video's admissibility at sentencing, given that it was obtained in violation of defendant's sixth amendment right to counsel. The trial court properly viewed the question as whether the exclusionary rule, typically applied to bar the substantive admission of unlawfully obtained evidence at trial, should be extended to bar evidence at a sentencing hearing. Per *Rose*, the fourth amendment case upon which the trial court relied, the exclusionary rule generally does not apply at sentencing hearings, but a court should apply the exclusionary-rule balancing test to determine if, under a given set of circumstances, the exclusionary rule should be extended to a sentencing hearing. The trial court declined to extend the exclusionary rule to the sentencing hearing and allowed the evidence, and the State seeks to uphold that ruling. Defendant does not argue that he should prevail under the exclusionary-rule balancing test. Rather, he continues to argue, as he did below, that the sixth amendment provides "greater constitutional protections regarding illegally obtained evidence" than the fourth amendment. For the reasons that follow, we agree with the trial court and determine that defendant's position is incorrect.

¶ 53                     i. The Exclusionary Rule, *Ventris*, and *Rose*

¶ 54 The exclusionary rule is a judicially created rule that aims to prevent evidence obtained in violation of certain constitutional rights, usually fourth amendment rights, from being used against the defendant in a criminal proceeding. *Id.* at 941. The purpose of the exclusionary rule

- 10 -

is to deter unlawful police conduct in the future. *Id.* If the purpose of a requested exclusion is to deter police conduct in the future, then the exclusionary rule can apply to the fifth and sixth amendment as well. *Ventris*, 556 U.S. at 591. The exclusionary rule is not a personal constitutional right of the aggrieved party. *Rose*, 384 Ill. App. 3d at 941. The exclusionary rule is not concerned with a situation where the introduction of the unlawfully obtained evidence would itself exacerbate or constitute a violation—again, its purpose is deterrence. *Ventris*, 556 U.S. at 591.

¶ 55    Regardless of the type of proceeding, the test for applying the exclusionary rule requires weighing the likelihood of deterring future police misconduct against " 'the costs of withholding reliable information from the truth-seeking process.' " *Rose*, 384 Ill. App. 3d at 945 (quoting *Illinois v. Krull*, 480 U.S. 340, 347 (1987)). This test is known as the exclusionary-rule balancing test. *Ventris*, 556 U.S. at 591.

¶ 56    Typically, the application of the exclusionary-rule balancing test bars unlawfully obtained evidence from being used substantively at trial. See, *e.g.*, *Rose*, 384 Ill. App. 3d at 941-45. In fact, that the exclusionary rule should bar such evidence at trial is so often taken for granted that we rarely see the balancing test performed in that context. Instead, the balancing test is most often used to determine whether the exclusionary rule should be extended *beyond* its typical use to also bar unlawfully obtained evidence for nonsubstantive, impeachment purposes at trial or for substantive purposes at sentencing. See, *e.g.*, *Ventris*, 556 U.S. at 593 (declining to extend the exclusionary rule to bar unlawfully obtained evidence for nonsubstantive, impeachment purposes at trial); *Rose*, 384 Ill. App. 3d at 945 (declining to extend the exclusionary rule to bar unlawfully obtained evidence for substantive purposes at sentencing).

¶ 57    In cases involving the admissibility of unlawfully obtained evidence for nonsubstantive, impeachment purposes at trial or substantive purposes at sentencing, the application of the exclusionary-rule balancing test typically results in the admission of the evidence. *Rose*, 384 Ill. App. 3d at 945. The reason for this trend is that courts deem it unlikely that police officers would risk the fruits of prior legitimate law enforcement activities merely to gain a chance at impeachment or a lengthier sentence. *Ventris*, 556 U.S. at 593; *Rose*, 384 Ill. App. 3d at 944. Also, as we will discuss, evidentiary standards at sentencing hearings are "much less rigid" than those at trial. *Rose*, 384 Ill. App. 3d at 940. An exception to the trend might occur if the police violated the defendant's constitutional rights for the very purpose of obtaining a lengthier sentence. *Id.* at 943. In that instance, excluding the evidence would have a higher deterrent value, and the evidence would more likely be excluded at sentencing. *Id.* Nevertheless, the general rule that unlawfully obtained evidence that would be excluded at trial for substantive purposes may be admitted at sentencing. See *id.* at 944.

¶ 58    *Ventris* and *Rose* each illustrate the use of the exclusionary-rule balancing test. In *Ventris*, the State admitted that it violated the defendant's sixth amendment right to counsel when it planted an informant in the defendant's jail cell. The defendant was represented by counsel at the time, and the State questioned the defendant through the informant, outside the presence of counsel. The defendant made incriminating statements to the informant, stating that he had personally shot the victim. At trial, the defendant testified that the codefendant shot the victim. The State sought to impeach the defendant through the informant's testimony. The trial court held that the defendant's statements to the informant were not admissible at trial for any reason, including impeachment. The United States Supreme Court reversed, applying the exclusionary-rule balancing test to determine the admissibility of evidence obtained following

a sixth amendment violation. *Ventris*, 556 U.S. at 588. The Court stated that the test is appropriate when the exclusion comes by way of a deterrent sanction rather than to avoid a violation of a substantive guarantee. *Id.* at 593. Under the test, the Court determined that what little deterrent value there might be in excluding the evidence for impeachment purposes at trial was outweighed by the need to prevent perjury and preserve the integrity of the trial process. *Id.*

¶ 59    More specifically, the Court explained that whether the exclusionary rule should be extended not only to bar substantive use of the evidence at trial but also to bar use of the evidence for impeachment at trial depends upon the nature of the constitutional guarantee that is violated. *Id.* at 590. For instance, the fifth amendment is typically violated *when a coerced confession is introduced at trial*, whether substantively or for impeachment. *Id.* The introduction of the evidence is itself a violation, and the evidence should be barred. *Id.* In contrast, the fourth amendment is violated *when the person is subjected to an unreasonable search or seizure*, not when the fruits of that search or seizure are introduced at trial. *Id.* at 591. Therefore, inadmissibility based on a fourth amendment violation is not automatic; rather, admissibility is determined according to the exclusionary-rule balancing test. *Id.* The same can be true for a fifth or sixth amendment violation, if the violation was due to the improper police conduct and not due to the very fact of the introduction of the evidence at trial. *Id.* In those instances, prophylactic considerations apply, and the court should conduct the exclusionary-rule balancing test to determine admissibility. *Id.*

¶ 60    The Court further explained that, in the case before it, the defendant's sixth amendment rights were violated *when he was interrogated* through the informant in his cell:

> "It is illogical to say that the right is not violated until trial counsel's task of opposing conviction has been undermined by the statement's admission into evidence. A defendant is not denied counsel merely because the prosecution has been permitted to introduce evidence of guilt—even evidence so overwhelming that the attorney's job of gaining an acquittal is rendered impossible. In such circumstances the accused continues to enjoy the assistance of counsel; the assistance is simply not worth much. The assistance of counsel has been denied, however, at the prior critical stage which produced the inculpatory evidence." *Id.* at 592.

¶ 61    The Court reasoned that the case did not involve the prevention of a constitutional violation; it involved the scope of the remedy for a violation that already occurred. *Id.* at 593. Given that the statements would be used for impeachment, and not substantively, the Court found little deterrent value in excluding the statements. *Id.* In its view, police officers have significant incentive to comply with constitutional requirements so the evidence they obtain can be used substantively. *Id.* Balancing the minimal deterrent value against the need to prevent perjury weighed in favor of allowing the evidence for impeachment purposes. *Id.* " 'It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can . . . provide himself with a shield against the contradiction of his untruths.' " *Id.* (quoting *Walder v. United States*, 347 U.S. 62, 65 (1954)).

¶ 62    Defendant argues that *Ventris* is inapposite because the evidence there was used for impeachment at trial, not for substantive purposes at the sentencing hearing. We disagree. *Ventris* is on point because it instructs lower courts how to determine if the exclusionary rule should be extended beyond barring evidence for substantive use at trial. Again, *Ventris*

instructs the court to first determine whether the purpose of the requested exclusion is to deter unlawful police conduct in the future or whether it is to prevent a violation of a constitutional guarantee from then occurring. If the purpose is to deter unlawful police conduct in the future, then the court should apply the exclusionary-rule balancing test to determine if the exclusionary rule bars the evidence.

¶ 63    *Rose* also illustrates the use of the exclusionary-rule balancing test, this time in the context of a sentencing hearing's liberal evidentiary standards. Evidentiary standards used at sentencing are much less rigid than those used at the guilt-innocence phase of a trial. *Rose*, 384 Ill. App. 3d at 940. At sentencing, the defendant's guilt has already been established, and the court's remaining task is to determine the appropriate punishment, within statutory and constitutional limits. *Id.* The court should possess the fullest information available concerning the defendant's life and characteristics in order to fashion an appropriate sentence. *Id.* at 940-41. The court may consider, *inter alia*, the defendant's moral character, habits, social environment (family life and occupation), abnormal tendencies, age, natural inclination or aversion to commit crime, and criminal record. *Id.* at 941. "The source and type of information that the sentencing court may consider is virtually without bounds." *Id.* (citing *People v. La Pointe*, 88 Ill. 2d 482, 496 (1981)). Evidence need only be relevant and reliable to be admitted at a sentencing hearing. *Id.* It is within the sentencing court's discretion to determine whether evidence is relevant and reliable. *Id.*

¶ 64    In *Rose*, the defendant pleaded guilty to intent to manufacture a controlled substance. At sentencing, the State sought to introduce evidence of a drug lab in the defendant's apartment years prior. The defense objected because that evidence had been suppressed in a previous case against the defendant. The evidence had been obtained in violation of the defendant's fourth amendment rights because the police failed to obtain the defendant's consent before entering his apartment. The State responded that, even if the evidence would be suppressed for substantive purposes at a trial, it was admissible at sentencing. The trial court agreed.

¶ 65    The appellate court affirmed. The court first explained that the exclusionary rule generally did not apply to sentencing hearings. *Id.* at 944. It then conducted the exclusionary-rule balancing test, weighing the potential deterrent effect of applying the exclusionary rule at sentencing against the goal of having the sentencing judge consider all available relevant and reliable information in fashioning the most appropriate sentence. *Id.* It noted that the suppressed information originated from an unrelated case years prior, so there was little deterrent value in excluding it now at sentencing. *Id.* There was no colorable claim that the police had violated the defendant's fourth amendment rights for the purpose of enhancing an unrelated sentence years later. *Id.* The court concluded: "Against the very minimal deterrent effect of excluding evidence at sentencing we juxtapose society's broad interest in having criminals appropriately sentenced ***. The test obviously weighs in favor of allowing the sentencing court to consider the previously suppressed evidence ***." *Id.*

¶ 66    Here, as in *Ventris* and *Rose*, the constitutional violation occurred when the evidence was obtained, during the interrogation. The requested exclusion would have served as a deterrent sanction, not as a way to avoid a violation of a substantive guarantee. Therefore, it was appropriate for the trial court to perform the exclusionary-rule balancing test to determine whether the evidence should be excluded.

¶ 67    We now consider the trial court's balancing of the factors relevant to the exclusionary-rule balancing test. On one side of the scale, we have "society's broad interest in having criminals

- 13 -

appropriately sentenced and the corresponding detrimental effect of excluding relevant and reliable evidence from the sentencing court's determination of the proper punishment." *Id.* On the other side of the scale, we have what the trial court reasonably determined to be the very minimal deterrent effect of excluding the evidence at sentencing. See *id.* Neither party argues that the police violated defendant's rights for the purpose of obtaining a longer sentence for the charged offenses. The statements could be used in a future prosecution for the uncharged offense. Separately, we note that defendant's allegation of unfair prejudice is rebutted by the record. Defendant argues that the video was prejudicial because his statement that he was in a dreamlike state could show a lack of empathy and remorse. However, in rendering its sentence, the court recognized defendant's remorse: "The court would acknowledge that [defendant] has in fact accepted responsibility for the crimes that he has committed. That is a credit to him. He also appears to be remorseful for his past actions." Moreover, defendant concedes that the information in the video was relevant and reliable and, therefore, meets the basic evidentiary standard to be admitted at a sentencing hearing. In sum, given the lax evidentiary standards at sentencing, the overriding goal of crafting an appropriate sentence with as much relevant and reliable information as possible, and the minimal deterrent value in excluding the video at sentencing, the trial court did not abuse its discretion in admitting the video despite the earlier sixth amendment violation.

¶ 68     Defendant's remaining arguments do not convince us otherwise. Defendant cites two lines of cases to support his position that the sixth amendment affords greater protections regarding unlawfully obtained evidence than the fourth amendment. First, he cites *Bishop*, 701 F.2d at 1157, where the State was precluded from introducing a letter from the defendant to his attorney, even for impeachment purposes. Second, he cites *Estelle* and *Kidd*, two death-penalty cases, which he believes stand for the proposition that, where the sixth amendment is concerned, there is no difference in the evidentiary standards at the guilt and punishment phases of proceedings.

¶ 69     In *Bishop*, the sheriff's department conducted a legal search of the defendant's prison cell after an attempted escape by the defendant's cellmate. During the search, the department found a 14-page handwritten statement by the defendant to his attorney. In the statement, the defendant detailed his whereabouts on the night of the crime. At trial, the court disallowed the statement as substantive evidence, but it allowed the prosecutor to use the statement to impeach the defendant during cross-examination.

¶ 70     On appeal, the court held that the use of the defendant's statement, even for impeachment, violated the defendant's sixth amendment right to counsel, specifically his attorney-client privilege. *Id.* The court distinguished fourth amendment cases holding that evidence obtained in violation of the fourth amendment may be used for impeachment purposes at trial. *Id.* It explained that, in the fourth amendment cases, the use of the illegally seized evidence did not implicate a separate and additional constitutional right. *Id.* However, in the case before it, the prosecution's very act of putting confidential communications before the jury, even for the purpose of impeachment, was itself an impingement on the defendant's sixth amendment right to counsel. *Id.* The court was not concerned with the scope of the remedy for a constitutional violation that already occurred or the deterrent impact that excluding the evidence might have on future unlawful conduct; it was concerned with preventing a constitutional violation from occurring during the proceedings. See *id.*

¶ 71    Thus, we disagree with defendant's synthesis of *Bishop*. Rather than support defendant's position, the rationale set forth in *Bishop* is consistent with that set forth in *Ventris*. Factually, *Bishop* is the inverse of *Ventris*, and through their opposite results, the two cases demonstrate consistency in the law. In *Bishop*, the purpose of the requested exclusion was to prevent a violation of a constitutional guarantee from then occurring, and thus the evidence was barred, even for impeachment. In *Ventris*, the purpose of the exclusion was to prevent unlawful conduct in the future, and after the court balanced the relevant factors, it admitted the evidence for impeachment. *Bishop* does not stand for the proposition that the sixth amendment affords "greater" protection than the fourth amendment. Rather, like *Ventris*, it stands for the proposition that it is important to consider whether the purpose of the requested exclusion is to address a constitutional violation that has already taken place—to deter future unlawful conduct by police—or whether the purpose of the requested exclusion is to prevent a constitutional violation from then occurring during the proceedings. As the Supreme Court recognized in *Ventris*, this distinction does not place all fourth amendment cases on one side and all sixth amendment cases on the other.

¶ 72    Finally, we address the two death-penalty cases cited by defendant, *Estelle* and *Kidd*. Defendant posits that these cases show that, where the sixth amendment is concerned, there is no difference in the evidentiary standards at the guilt and punishment phases of proceedings. We disagree.

¶ 73    In *Estelle*, the State failed to provide the defendant with a *Miranda* warning or notify his appointed counsel before he submitted to a pretrial psychiatric interview concerning the charged offenses. The main purpose of the interview was to establish competency to stand trial, but the interview also encompassed the issue of the defendant's future dangerousness, which would prove a key consideration at the subsequent death-penalty hearing. These circumstances violated both the defendant's fifth amendment right against self-incrimination, due to the failure to provide a *Miranda* warning, and his sixth amendment right to counsel, due to the failure to notify counsel. *Estelle*, 451 U.S. at 467, 471. Therefore, the psychiatrist should not have been allowed to testify at the death-penalty hearing to the contents of the pretrial examination. *Id.* at 473.

¶ 74    *Estelle* focused mainly on the fifth amendment violation, but it carried over its rationale to the sixth amendment as well. The Court stated:

> "Just as the Fifth Amendment prevents a criminal defendant from being made 'the deluded instrument of his own conviction' [citation], it protects him as well from being the 'deluded instrument' of his own execution.
>
> We can discern no basis to distinguish between the guilt and penalty phase of respondent's *capital murder trial* so far as the protection of the Fifth Amendment privilege is concerned. *Given the gravity of the decision to be made at the penalty phase*, the State is not relieved of the obligation to observe fundamental constitutional guarantees." (Emphases added and internal quotation marks omitted.) *Id.* at 462-63.

¶ 75    In *Kidd*, the sixth amendment case involving the 1980 and 1984 fires that we have already discussed, the Illinois Supreme Court followed *Estelle*'s rationale and barred the unlawfully obtained evidence at the death-penalty hearing. *Kidd*, 129 Ill. 2d at 454.

¶ 76    *Kidd* and *Estelle* are inapposite, because they involve death-penalty hearings as opposed to ordinary sentencing hearings. The *Estelle* Court's statement that there is no difference between the evidentiary standards at guilt and penalty phases was made with specific reference to a

- 15 -

"capital murder" case and a penalty hearing with a uniquely "grave" consequence. *Estelle*, 451 U.S. at 462-63. To apply that statement to all sentencing hearings would completely upend the general rule that evidentiary standards at sentencing are much less rigid than at trial and that evidence need only be relevant and reliable to be admitted at sentencing.

¶ 77 Defendant points to the concluding statement in *Kidd* as an indication that the court intended its ruling to extend to noncapital cases. The court stated: "Because defendant's sixth amendment rights were violated, his statements given during the [interview with the detective investigating the 1980 fire] and all references to them are inadmissible at a future trial *or sentencing hearing*." (Emphasis added.) *Kidd*, 129 Ill. 2d at 454 (citing *People v. Szabo*, 94 Ill. 2d 327, 360 (1983)).

¶ 78 We do not agree that the *Kidd* court's reference to a "sentencing hearing" meant "any and all sentencing hearings." Although the court referred to a sentencing hearing, that statement was made in the context of a sentencing hearing in a capital case. Further, *Kidd* cited *Szabo*, which, in turn, specified that its strictures pertained to a sentencing hearing in a capital case: "We reiterate that because the decision to invoke the death penalty is such a serious one, the State remains obliged at the sentencing hearing to observe fundamental constitutional guarantees. [Citation.] *** This is true whether it be at trial or at the sentencing hearing." *Szabo*, 94 Ill. 2d at 360. As such, *Kidd* does not indicate that its statement should be extended to noncapital cases. Again, to apply the strict evidentiary standards of death-penalty hearings to all sentencing hearings would upend the general rule that evidentiary standards at sentencing are much less rigid than at trial and that evidence need only be relevant and reliable to be admitted at sentencing. Contrary to defendant's position, *Estelle* and *Kidd* do not show that the sixth amendment affords greater protection than the fourth amendment as it pertains to the admission of unlawfully obtained evidence. Rather, *Estelle* and *Kidd* simply show that evidentiary standards are higher at death-penalty hearings than at ordinary sentencing hearings.

¶ 79 B. The Trial Court Did Not Consider
the Statutory Amendment as a Factor in Aggravation

¶ 80 Defendant next argues that the trial court considered an improper factor in sentencing him by allowing the State to argue the "logic and reasoning" of an inapplicable statutory amendment as a factor in aggravation. The State noted in argument that, several years after defendant committed the charged offenses, the legislature amended the statute to mandate a natural-life sentence for a person convicted of two or more separate incidents of predatory criminal sexual assault. The State acknowledged that the amendment did *not* apply to defendant retroactively, but it urged the court to consider the "logic and reasoning" behind it. That is, it asked the court to consider that a person who commits more than one predatory criminal sexual assault is a danger to society, is likely to commit the offense again, and has greatly harmed his victims. In the State's view, defendant was such a person. The State asked for the "harshest sentence possible."

¶ 81 While sentences are ordinarily reviewed for an abuse of discretion, the trial court has no discretion to consider an improper sentencing factor. *People v. Walker*, 2012 IL App (1st) 083655, ¶ 30. There is a strong presumption that the trial court based its sentencing determination on proper factors. *People v. Dowding*, 388 Ill. App. 3d 936, 942 (2009). To determine whether the trial court relied on improper factors, the reviewing court should consider the record as a whole. *Id.* at 943.

- 16 -

¶ 82    Defendant contends that the State's argument was improper, because the State asked the court to consider the policy behind a law *ex post facto*. See 5 ILCS 70/4 (West 2016) (no new law shall be considered to repeal a former law). Defendant also cites *People v. Hill*, 14 Ill. App. 3d 20, 23 (1973). In *Hill*, the trial court commented that the defendant could have been charged with a felony rather than a misdemeanor, and it proceeded to sentence him to the maximum penalty for his offense. *Id.* The appellate court determined that the trial court should not have considered a potential felony charge where the defendant had not, in fact, been charged with or convicted of a felony. *Id.* Because the trial court had considered an improper sentencing factor, the appellate court reversed and remanded for resentencing. *Id.*

¶ 83    *Hill* is distinguishable because, here, it is the State that made the complained-of argument, not the court. Therefore, even if the State's argument was improper, the court did not necessarily accept it.

¶ 84    Defendant argues that the trial court considered the statutory amendment as a factor in aggravation because it overruled defendant's objection to the State's argument and stated generally that it considered the arguments of both parties. This is not enough to show that the court considered the statutory amendment *as a factor in aggravation*. When the court overruled defendant's objection, the court noted that "[i]t's argument." In so stating, the court assured defendant that it would not necessarily accept and assign weight to the argument. Further, there is no indication in the record that the court did so. The court's perfunctory statement that it considered the parties' arguments is insufficient to rebut the strong presumption that the court based its sentence on proper legal reasoning.

¶ 85    Indeed, the record supports that the court afforded no weight to the argument. When a trial court sentences a defendant to substantially less than the statutory maximum, that is an indication that it did not accord significant weight to an improper factor. *Dowding*, 388 Ill. App. 3d at 945. Here, the State urged the court to accept the "logic and reasoning" behind the amendment's mandatory life sentence to give defendant "the harshest possible" sentence. The court had discretion to sentence defendant, then age 48, to an effective life sentence of 67 years. Instead, it chose to sentence defendant to 32 years, 28 of which would be served at 85%, for a total of 27.8 years, meaning that defendant could be released at age 75.

¶ 86    In short, the State argued not that the new statute should apply but that the policy behind it should apply. The new statute would have removed the trial court's discretion and mandated a life sentence. The court here exercised its discretion and imposed a sentence that was not close to life. The shorter sentence shows that the court filtered out any improper aspect of the State's argument.

¶ 87    We acknowledge that, despite being in the midrange, the court nevertheless issued a lengthy sentence. Still, this was justified by the seriousness of defendant's crimes, the repeated nature of his crimes, and the harm caused to the victims. In issuing its sentence, the court referred to defendant as a predator and stressed the harm caused to the victims. The sentence was proper, and there is no indication that the court considered an improper factor in aggravation.

¶ 88                                    III. CONCLUSION

¶ 89            For the reasons stated, we affirm the trial court's judgment.

¶ 90            Affirmed.